J. Edwin O'Brien

*v.*

State of Tennessee.

(*Nashville,* December Term, 1958.)

Opinion filed July 27, 1959.

H. Frank Taylor and Z. T. Osborn, Jr., Nashville, for plaintiff in error.

James M. Glasgow, Assistant Attorney General, for the State.

Mr. Justice Burnett, delivered the opinion of the Court.

O'Brien was indicted on the charge of receiving and concealing stolen property. He was convicted of this offense and sentenced by the jury and the trial court to three years in the penitentiary. He filed his motion for new trial raising various questions which motion was on May 23, 1958, overruled. To the order overruling this motion for new trial an exception was taken and an appeal was prayed in the nature of a writ of error to this Court.

The State has filed a motion herein to affirm the judgment below on the ground that there is no error in the technical record, and that the bill of exceptions was not filed within the time required by Section 27-111, T.C.A.

We must of course dispose of this motion before considering anything else herein.

The technical record discloses that the motion for new trial was overruled on May 23, 1958, and that a final judgment was entered therein allowing the plaintiff the statutory allowance of 30 days within which to file a bill of exceptions. On June 17, 1958, the trial judge entered an order granting an additional 60 days from June 22, 1958, within which to file the bill of exceptions. The bill of exceptions and each volume of the proof was filed with the Clerk of the Circuit Court on August 22, 1958, as is shown by his penned notations on various volumes of the record and is shown by order at the end of the technical record.

The plaintiff in error through his counsel has filed a motion in which he suggests a diminution of the record. This motion is accompanied by a statement of the trial judge in support thereof. The motion is to the effect that the record contains an inadvertent clerical error in that the order of the trial judge should have stated that the 60 day period for filing the bill of exceptions was from June 23, 1958, instead of June 22, 1958. June 22, 1958, fell on Sunday and of course it is obvious that at the time the order was drawn and entered on June 17, 1958, that this was not noticed. The trial judge in his statement which is dated January 13, 1959, said that the order he entered and signed should have been computed from and after June 23, 1958, instead of June 22, 1958. As we see it the motion for diminution of record makes no difference one way or another in view of the mandatory provision of the statute when taken into consideration with the time in which the final judgment was en-

tered on May 23, 1958, and the time that this record was filed on August 22, 1958.

The statute (Sec. 27-111, T.C.A.) is very explicit as to the power of the trial courts to extend the time for filing a bill of exceptions and as to the time said bill of exceptions shall be filed. This statute in substance provides that the trial judge within the 30 day period after final judgment either is or after term time may extend the time for filing the bill of exceptions "for not exceeding an additional sixty (60) days." Then follows the controlling section under the situation of this case as is shown by the technical record. The statute provides then:

"The maximum period of ninety (90) days shall be computed, in case of a bill of exceptions, from the date of final judgment, * * *."

Obviously under this language it is apparent that the Legislature intended that a plaintiff in error shall have a maximum of 90 days from the date of entry of final judgment within which to file a bill of exceptions.

██ When we compute the number of days herein and exclude the first day we find that there were 9 days in May, 30 days in June, 31 days in July and 22 days in August, that is including the 23rd of May, and the 22nd of August when it was filed. If we take from it then the first day which is excluded according to Section 1-302, T.C.A., we find that the bill of exceptions was filed 91 days after the final judgment. Obviously this is one day too late. Under such a situation we have no jurisdiction, power or authority to consider the bill of exceptions. *Anderson v. State,* 195 Tenn. 155, 258 S.W.2d 741, (opinion by Chief Justice Neil). In this case the bill of exceptions was filed one day too late. In *Suggs v. State,*

195 Tenn. 170, 258 S.W.2d 747, wherein as in the Anderson case the question of when the trial judge might extend the time it was considered, this Court among other things said:

"A defendant under this Code Section may have as much as 90 days within which to present his bill of exceptions for the signature of the trial judge provided the trial judge within the 30 day period from the overruling of the motion for new trial enters an order granting this additional 60 days."

A related situation is likewise found in *DuBoise v. State,* 200 Tenn. 93, 290 S.W.2d 646. In each of these three cases the statute here in question, Section 27-111, T.C.A., is discussed under a different factual situation as shown in those technical records. The principle though here when the bill of exceptions is not filed within the 90 days is exactly the same and we are bound thereby.

At the time this case was orally argued before this Court the plaintiff in error was permitted to respond to the motion to strike above discussed. In a very few days after argument a bill was presented to the General Assembly which was enacted by that body and signed by the Governor as Chapter 56 of the Public Acts of 1959. In this Act the Legislature provided that the Statute above referred to (Section 27-111, T.C.A.) should be amended to provide that when the last day in the computation of the 90 day period falls on Sunday the time for filing the bill of exceptions where either the initial 30 day period or the 90 day period falls on Sunday should be extended an additional day. The Act also provides that the same shall have a retroactive effect.

Thus it is under this amended Act which was passed after the case was argued before us and within the time allowed to respond to the motion to strike the bill of exceptions that the State raises numerous questions in objection to the Act applying under circumstances of the facts in reference to filing a bill of exceptions in this case. The State has filed briefs thereon which have been responded to by the plaintiff in error and the Court has done considerable independent investigation on the question of whether or not the Act can be thus amended. These briefs and our investigation disclose that the authorities are in hopeless conflict under such a situation. Sutherland on Statutory Construction, 3rd Edition, Horack, Vol. 2, Section 2218, p. 146 says:

"Where the right of appeal has been lost by expiration of statutory time limit, the legislature may by curative act extend the original time limit, thus in effect reviving a cause of action."

The contrary to this statement was held by the Supreme Court of Iowa in *Ford v. Lenander,* 1909, 145 Iowa 106, 123 N.W. 746, when that Court said:

"The right of appeal was gone, therefore, when the act became law. There having been no appeal under our decisions, when the time therefor expired, the subsequent enactment of the statute in question could not in any event revive such right."

On reading this case we find the question of whether or not the Act was made retroactive was not before the Court. The courts are not uniform on the question at all and many of them go off on the proposition that the Legislature having the right to pass the limitation pe-

riod, as in Section 27-111, T.C.A., that they therefore have a right to extend this period.

Of course for the reasons stated in the outset of this opinion the bill of exceptions was a nullity under the Statute as in effect at the time this appeal was prayed. After our investigation of the authorities we are constrained to hold that in this State we are more or less bound to hold by the rule of stare decisis that the Legislature did have the right to pass such an act and when they did so and made it retroactive we must, not having finally disposed of the case, give heed to the legislative act.

We make the last statement by reason of the fact that in 1946 this Court denied a petition for certiorari in the case of *National Life & Accident Ins. Co. v. Atwood*, 29 Tenn.App. 141, 194 S.W.2d 350, 353, wherein a related question was raised. That court in following a Virginia case held that these procedural rules governing the right of appeal might be so amended. The Court of Appeals says in reference to the Virginia case, and they follow it:

"There a new act of the legislature gave the right of appeal in certain cases in which the right was barred under existing law. The act extending the right of appeal was sustained as against the contention that it deprived the appellee of a vested right."

Thus it is that we have concluded that it is the duty of this Court to give the amendatory act of 1959 effect in the instant case and therefore we can and must consider the case on its merits as presented by the bill of exceptions thus perfected.

■ We now come to consider the case on its merits. There are no assignments on the facts. After reading this record it is perfectly clear to us without the peradventure of a doubt that the plaintiff in error under the facts is guilty. The only proof offered is that offered on behalf of the State, (the plaintiff in error does not take the witness stand).

Briefly the record shows that a man by the name of Craig was in the wholesale appliance business in Nashville and did business under the name of Appliance Distributors of Nashville in which he handled various and sundry types of electrical appliances and replacement parts for them. His business had formerly been owned by a corporation in which he was a stockholder but for some four or five years before the trial which was in February, 1958, he had been the sole owner of this business as is shown by his testimony. Mr. Craig testified as to the various and sundry items that were listed in the indictment which the plaintiff in error was charged with receiving and concealing. Mr. Craig definitely testified as to each of these items, that none of them had been sold and that at two or three different times he found they were missing from his place. He attributed, and it was clearly inferrable from the record and this is the only inference, that a colored man who worked for Mr. Craig as a storehouse keeper stole these items from his storehouse and took them to the plaintiff in error's home and a warehouse that the plaintiff in error had rented during 1955. It is also shown by the record that a number of sewing machines that were stored in this storehouse which came from Mr. Craig's business were hauled to Miami, Florida, by a confederate of the plaintiff in error who was a witness herein and at least two of these

machines were sold in Miami for at least $100 each. These machines were sent to Miami by the plaintiff in error and the ones that were not sold were returned to Nashville to the plaintiff in error.

Mr. Craig, the owner of this business, received word that part of this stolen property was at the home of Mr. O'Brien. As a result of this, a search warrant was secured for this home. In the search by the officers of the home more than a typewritten foolscap page of various and sundry things that were found there were identified by Mr. Craig and by other means as having come from his place of business and had not been sold by him. Mr. Craig met the police officers when they went to serve this search warrant and was there present at the time. He likewise makes various and sundry statements in the record which of course are true since they have not been contradicted and we must take them as true, what O'Brien said to him about them. O'Brien told him that he was merely storing these different articles for another person. As to one or two of the articles he said that he had bought them from Mr. Craig's place of business. When this was checked it was found that these items had not been bought there and there was no record whatsoever of them having been sold to anyone and particularly the plaintiff in error.

The person to whom the plaintiff in error said that these things belonged, and who he was keeping them for, was located in Miami. He testified at length in this record. This witness testifies that he had been just a common drunk and as such would do most anything to get liquor and to get money to buy liquor with and that while in this condition he saw the plaintiff in error several

times and that the plaintiff in error bought him liquor and had him steal various and sundry articles from different places around including houses that were being built, etc., and that the plaintiff in error bought these stolen things from him. This same witness also testifies as to the load of sewing machines that the record shows without contradiction came from the Craig place that were brought to Florida and about his attempting to sell these things in Florida. Another Nashville citizen, a young man, who had stolen different things and who hauled these things to Florida for the plaintiff in error testifies about it and how much they got for them, etc., and the fact that he called O'Brien from Florida and asked him what was the matter with the machines, why it was that everybody was afraid of them; asked him if they were stolen and the plaintiff in error told him they were not stolen. The whole tenor of all the evidence, all the way through, is that the plaintiff in error made a business and profession out of receiving stolen goods and then re-selling them somewhere else.

Another indication and illustration of the fact that these things were stolen was that some of the serial numbers on some of the machines had been filed off. The State, through a man of long experience with the Federal Bureau of Investigation, found a way to raise these numbers and find out what the numbers were where they had been filed off and he identified them as corresponding with the invoices of the machines that had belonged to Mr. Craig and had never been sold by Mr. Craig.

The two witnesses above referred to, the one from Florida and the one who hauled the things down there,

were produced and admitted stealing property and selling it to the plaintiff in error. (All of these things are without objection.) It should be said that the drunk admitted stealing and doing these things for the plaintiff in error, had now reformed and had a remunerative position with the City of Miami.

It is very forcefully argued by the plaintiff in error that the trial judge erred in refusing to suppress the evidence obtained by the search warrant. The argument is made that the warrant is invalid and void because it was based on information and belief without disclosing the nature and source of the information. It is also argued that the information disclosed was insufficient to justify the issuance of the warrant. In support of this argument the plaintiff in error relies upon the case of *Elliott v. State,* 148 Tenn. 414, 256 S.W. 431. We do not think that this case is in point. This Court has held on numerous occasions that contests about facts concerning the issuance of search warrants must be determined by the issuing magistrate. Section 40-514, T.C.A., would certainly indicate as much. In *Gallimore v. State,* 173 Tenn. 178, 116 S.W.2d 1001, 1002, this Court said:

"It is for the magistrate himself to determine, whether, in any case before him, it is essential that the name of an informant, otherwise shown to him to be a reliable person, shall be given."

The tenor of the opinion otherwise is as to other facts herein argued is the same as the quotation above. See also in support of this statement, *Solomon v. State,* 203 Tenn. 583, 315 S.W.2d 99; *Zimmerman v. State,* 173 Tenn. 673, 122 S.W.2d 436.

 In determining whether or not probable cause exists for the issuance of search warrants, the issuing magistrate performs a judicial act which is not subject to review by the court unless probable cause is not shown on the face of the warrant. The falsity of averments made in an affidavit, made prior to the issuance of the warrant, cannot be impeached by oral testimony at the trial. *Solomon v. State,* supra, *Goss v. State of Maryland,* 198 Md. 350, 84 A.2d 57, and *Troxell v. State,* 179 Tenn. 384, 166 S.W.2d 777. It seems to us that probable cause is shown in the affidavit which constituted some two of three pages covering all the items hereinbefore referred to. We think that probable cause is shown by this affidavit and it cannot be collaterally attacked in the trial after the return of the indictment.

 It is also argued that the trial judge should have granted a mistrial because the District Attorney General offered evidence to the effect that the plaintiff in error tampered with the jury on a previous trial wherein he was charged with receiving the goods having been stolen from a different place. The record clearly shows that when the District Attorney General asked a State's witness about a conversation with the plaintiff in error (he is the same witness who took the sewing machines to Florida for the plaintiff in error) which occurred during the first trial this was objected to and the jury excused. Outside of the hearing of the jury the witness testified that the plaintiff in error told him "they were trying to get to two of the jurors". This information or no taintable circumstance in reference thereto got before the jury. Be this as it may, though, when the jury returned to the jury room to continue the trial, and at the request of the counsel for the plaintiff in error, the court in-

structed the jury to disregard any question about anything which may have affected a jury in a former trial. As far as the record shows this ended the matter until the motion for new trial was filed. We think of course that we cannot assume that the jury considered the evidence to the prejudice of the plaintiff in error and we certainly cannot say that the jury disregarded the instruction of the trial judge. The fact of the matter is all presumptions are to the contrary.

It is also assigned as error and very forcefully argued that the jury was not, at all times, in the custody of an officer; that in his absence the jury had possible access to a telecast and may have had access to news casts which detailed accounts of inadmissible and prejudicial evidence not heard by the jury. This record discloses (as far as we have ever seen) in a rather unusual way of getting at this question. After the State had concluded its evidence and rested various and sundry motions were being made on behalf of the plaintiff in error. These questions then were brought out from a statement made by counsel in arguing one of these motions, and a colloquy which transpired between counsel for various sides and officers who had been attending the jury during this trial.

It is clearly shown from this colloquy that the officers on the instruction of the court had, when they gave the jury any newspapers to read, clipped out everything in the newspapers about the trial. The officers state that they never saw any of the jurors look at any telecasts of the news in reference to the trial. They say they did not think that the jury saw anything about the case. During this argument the Court asked counsel for the plaintiff

in error if they wanted to bring in the jury that had tried the case and determine from them whether or not they had seen any of these things. Such offer, though, was declined on behalf of the plaintiff in error. We of course do not approve of such a practice as was followed here in this case but as far as we can see we cannot possibly see how there is any injury done the plaintiff in error by what is said to have happened while the jury was in the jury room, while the case was not being tried. It is true the officers say that the only time they left the jury was when they would go down to get cigarettes or cokes or bring clothes to them and things of that nature. We do not think such circumstances show that there was any possibility of prejudicial matter getting to the jury, the fact is, just from the statements made, it seems to be more or less rebutted even though the jury was not put on the witness stand.

The newspapers which were referred to in these arguments were not filed as exhibits or made part of the record. It must be presumed that the trial judge properly refused a mistrial on this ground.

The question that really seems to be raised under this is whether or not it is reversible error for the officer in charge of a jury to leave the jury unattended so that it was possible for the jury to have witnessed a television news cast in the officer's absence while he had gone down to bring them up clothes or things referred to. We do not think it is, in view of the statements that were made here and that the record contains.

Since a juror may not be held disqualified because he has an opinion about the case, unless it be a fixed opinion which it would require evidence to overcome

*(Manning v. State,* 155 Tenn. 266, 292 S.W. 451), a fortiori he is not ·disqualified by virtue of having some knowledge or information about the case. We are not living in prehistoric ages and a jury cannot be kept in a sealed box during the time that they are participating in the trial of a criminal case. The jury is sworn to and makes an oath to try the case on the evidence as introduced in open court and the charge of the court as to the law thereon and unless there be some more showing or semblance of prejudicial matter getting to the jury that might influence them than there is in the present case clearly it should not be held as erroneous and reversible.

 In the cases of modern days that one reads wherein newspaper articles or television casts or things of that kind were shown to have come before the jury and the case was reversed and remanded for new trial they led the court to believe, that is, the seeing of these facts and things, that the jurors that had read them had been influenced thereby. To warrant a reversal, it must reasonably appear that the jurors, or at least some of them, had been influenced or prejudiced to the extent that they cannot be fair and impartial. Such evidence is lacking in this case.

 The general rule in regard to jurors reading newspapers during the trial is that the burden is on the plaintiff in error to show that this prejudiced the jurors. 16 C.J. Pages 1164, 1165; 23 C.J.S. Criminal Law sec. 1364. This same rule applies with equal force to television newscasts.

 Shortly after the enactment of the Harmless Error Statute in 1911, which is now carried in the Code as Section 27-117, T.C.A., this Court had before it the

case of *Munson v. State,* 141 Tenn. 522, 213 S.W. 916. In that case this Court held that since the passage of this Harmless Error Statute that the test in a criminal case is the guilt or innocence of the accused on the merits. It is difficult to understand under the facts of this case how these alleged errors hereinbefore enumerated and particularly the officer in charge of the jury being away from them for a few minutes as above related, could have affected the merits of the trial in any way. It is our thought that if it is error that clearly it is harmless error. The facts herein show beyond a peradventure of a doubt that the plaintiff in error is guilty of the crime charged. His rights as to a fair trial and a fair presentation of the evidence and the charge of the court have been protected. He has not been harmed in any legal proceeding that we can find herein.

█ One of the motions made at the end of trial and which was also preserved in the bill of exceptions, and is assigned here, is that there was a variance between the proof and the indictment. It is shown that some of the property described in the indictment belonged to Mr. Craig individually but some of it was bought by the corporation in the name of the corporation. The proof though shows that Mr. Craig had bought all the stock in the corporation and was the sole owner. The variance of whether it was bought by Mr. Craig individually or bought by the corporation does not make any difference. This matter was touched on, in other words the conclusion reached by this Court in *Cobb & Hargrove v. State,* 201 Tenn. 676, 301 S.W.2d 370, 374, really forecloses the question. The question here argued is not directly argued there but the result of the well-reasoned opinion answers this question fully. In this

case (*Cobb & Hargrove v. State,* supra) this Court made this very apt and pertinent statement which is applicable here:

"* * * it is immaterial whether the property was received from A. or from B. so long as the receiver knew that the property was stolen from the owner, the gravamen of the crime under the statute being the fact that the receiver knew that he was receiving stolen property."

Under the undisputed facts herein the plaintiff in error knew this. He is not hurt by this immaterial variance.

Then too, this question is foreclosed because the trial judge charged the jury upon request of the plaintiff in error that if it found that the property belonged to the corporation instead of to Craig that they should return a verdict of acquittal. Their verdict was to the contrary.

The indictment in conformity with the affidavit which was made for the search warrant alleged as we have said a whole typewritten page full of various articles listed and all together set at the total value of $2,500. The proof showed, and each of these items were taken up, some of them were worth $5 and some $170 through various and sundry amounts which we assume, but we have not computed them, would reach the amount of $2,500. At least there is ample proof in the record of many articles that were there that their value was over $100. The plaintiff in error by reason of the fact that the proof showed that these items were worth these different amounts that it was duplicitious because it was alleging separate and distinct offenses. As we see the argument they argue that some of these were stolen one

day and some another and some another and they had various values and it is argued therefore that the indictment was bad.

██ We see no merit to this contention. In *Chapple v. State,* 124 Tenn. 105, 135 S.W. 321, this Court held that the offenses of larceny and receiving and concealing stolen property are cognate offenses and may be alleged in separate counts of one indictment. This same case is authority for the proposition that an accused may be convicted of a lesser included offense charged in the indictment. This has been the practice in this State as far as we can remember or as the authorities show. Since the evidence clearly shows beyond a peradventure of a doubt that the value of the property was far in excess of $60 we do not think that the plaintiff in error can complain.

We have carefully read this record, read the briefs many times, read the authorities, made independent investigation and after having done so we are satisfied beyond any question as to the guilt of the plaintiff in error and that there is no reversible error in this record. The judgment of the trial court must therefore be affirmed.