**William David ARENDALL et al.,**
**Plaintiffs in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Jan. 3, 1974.

Certiorari Denied by Supreme Court March 18, 1974.

CORN'S Petition to Rehear Denial of Certiorari Denied May 6, 1974.

Robert T. McGowan, Asst. Public Defender, Mose J. Davie, Nashville, for plaintiffs in error.

David M. Pack, Atty. Gen., W. Henry Haile, Asst. Atty. Gen., Tom P. Thompson, Jr., and E. E. Edwards, Asst. Dist. Attys. Gen., Nashville, for defendant in error.

## OPINION

OLIVER, Judge.

With the concurrence of the defendants, they were tried simultaneously upon two separate joint indictments, each of which charged them with armed robbery. In case no. 8355, in which they were charged with robbing Betty Jean King and Frances King by use of a deadly weapon, upon conviction of that offense both Arendall and Marlowe were sentenced to 30 years in the penitentiary, and Corn was sentenced to 10 years. In case no. 8361, in which the defendants were charged with robbing Troy E. Lynn by the use of a deadly weapon, upon conviction Arendall was sentenced to 20 years in the penitentiary, to be served consecutive to his sentence in no. 8355; and Marlowe was sentenced to 30 years, to be served consecutive to his sentence in no. 8355; and Corn was acquitted. The defendants have brought their cases to this Court by their appeals in the nature of a writ of error.

The only Assignment of Error presented here by Corn, a juvenile, challenges the sufficiency of the evidence to warrant and sustain the verdict of the jury finding him guilty in case no. 8355—the King robbery. We summarize the material evidence.

When Troy E. Lynn closed his Nashville drug store about 9:20 p. m. on November 9, 1971 and got into his car, an unshaven man holding a sawed-off shotgun ran up to him and said, "Give me your money." As Lynn lowered his hands and began reaching into his pockets, the man said, "Don't put your hands in your pocket. Hand me the sack on the seat of the car." When Lynn handed the man the sack, which contained four or five packs of chewing gum and some pegboard hooks, the man told him, "Don't move from here cause another man has you covered." The robber then ran between a nearby church and a building next to it.

A witness walking in an alley between the drug store and some apartments saw three men, one of them wearing a stocking on his head and carrying a shotgun, run from behind some bushes near the church and get into a 1962 black Chevrolet bearing license plate no. 2–W 4913, and gave that information to Lynn when he saw him near the drug store and found out he had been robbed.

Lynn gave the police a description of the robber and of the automobile and the license number. About midnight, he identified Marlowe, then shaven, in a police line-up at which an attorney was present, and as to which the defendants took no exception. The evidence showed that after

his arrest and prior to the line-up Marlowe shaved because everyone else in the line-up was shaven. Lynn also positively identified him in open court at the trial.

Betty Jean King and her sister-in-law Frances King were employed in King's Market. About 9:45 the same night, after receiving a telephone call from another member of the family who also operated a grocery store and had a police-band radio and who apparently warned them of the possibility of a robbery, Betty took the money from the cash register and gave it to Frances to hide. Just as the latter began stuffing the money into her blouse, two men, one taller than the other and both wearing stockings on their heads, kicked the door open and ran to the cash register, and one of them said, "Give me the money." Betty replied, "There it is," referring to a package containing play money and six dollars in currency. For just such a contingency, she kept the package of play money wrapped with a few real bills. Both women were ordered to lie on the floor, but Betty did not lie down as ordered, but backed up against a cigarette case, "I never did lay down, you know. It's probably 'cause I knew both of them, you know." The taller man placed a sawed-off shotgun against her head. The shorter man, holding a sawed-off rifle, said, "Shoot her," or "Shoot her head off," and she heard a "click." The tall one "clicked that thing back on that gun." The taller man took the package of money, and upon hearing the sound of an approaching vehicle both of them fled.

Betty King recognized the taller man as the defendant Arendall, who had previously traded at the store. She also recognized Corn, who was an acquaintance of her son but she did not know his name. Both women identified Arendall in a line-up that night as the taller robber, and subsequently they both identified Corn in juvenile court as being the shorter man. Both women also identified Arendall and Corn in court.

Shortly after the King robbery, the three defendants, riding in a black Chevrolet with license plate no. 2–W 4913, were stopped at a police roadblock and arrested. A sawed-off shotgun and a sawed-off rifle were found in the car. Marlowe had six dollars in his left jacket pocket and $31 in his left pants pocket.

Testifying in his own behalf, Arendall did not deny participation in the robberies. He said that he and Corn took Marlowe, his uncle, to the Vol's Inn in north Nashville; that after leaving the restaurant about 7:00 p. m. he and Corn began drinking and taking "black beauties"; that about 9:00 o'clock that night he went back to the restaurant to get his uncle but did not find him there; that later while they were driving around Corn saw Marlowe on a bridge; that he could not remember anything between the time he started taking the drugs and the time they picked up Marlowe; that the shotgun and rifle were his and he had them in his car because "I didn't want nobody else to see them"; that he did not suggest the robberies to Corn or threaten him in any way; that he must have passed the drug store after picking up his uncle, and he might have been running behind the drug store; that Marlowe could have been with him carrying a shotgun; that he could not remember and could not say whether he and Corn participated in the two robberies, but remembered taking Marlowe to north Nashville, and that he and Corn then came back toward east Nashville, and remembered seeing Marlowe walking across a bridge and picking him up just before they were arrested.

Corn testified that after dinner the evening in question he and Marlowe and Arendall drove to a beer joint in north Nashville and Marlowe and Arendall went inside; that some 20 minutes later, at Arendall's request, he also went in and drank a beer and later played pool with Marlowe; that about 8:00 p. m. they started riding around and stopped at another beer joint; that he did not take any pills; that they later stopped near the drug store and Arendall and Marlowe began talking about

robbing it, because Arendall needed the money; that he told them he did not want to rob it, but Marlowe insisted that he participate and threatened to kill him if he did not do so and waved the shotgun in his face; that, in fear of his life, he went with Arendall to the side of the church; that as Lynn got into his car, Arendall ran to the car aiming his gun at him; that Marlowe came up and asked where Arendall was and he told him he was robbing Lynn; that Marlowe ran back to the car, and a few minutes later Arendall came running back and told him to run; that as they drove away Marlowe and Arendall began laughing because they had only got wall hangers; that they next stopped the car near King's Market, and Marlowe and Arendall said they were going to rob it and both of them told him Marlowe would kill him if he did not help; that he did not remember saying that "I wanted to kill Mrs. King, I didn't know it, and I still don't"; that when a car approached they ran to their car and were arrested a few minutes later; that Marlowe told him if he signed any papers he would tear his arms and legs off and kill him; and that the six dollars found in Marlowe's pocket was the same six dollars wrapped around the play money.

Marlowe did not testify or present any evidence.

◼ Corn insists that he participated in the King robbery because he was forced to do so by the threats of Arendall and Marlowe that the latter would kill him if he refused to help in the robbery. The law respecting coercion as a defense to a criminal charge is stated in 22 C.J.S. Criminal Law § 44:

"While the rule has no application in the case of homicide, and compulsion cannot excuse taking the life of an innocent man, . . . in general an act which would otherwise constitute a crime may be excused on the ground that it was done under compulsion or duress, since

the necessary ingredient of intention, . . . is then lacking.

"The compulsion or coercion which will excuse the commission of a criminal act must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done; it must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed. However, it is not necessary that accused show that he was absolutely driven and made to commit the act charged as a crime."

In this case, Corn's contention that he acted under compulsion by the other two defendants rested on his testimony alone. The jury obviously rejected that theory.

Considered in the light of the time-honored rules governing appellate courts in reviewing the evidence in criminal cases when its sufficiency is challenged, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Chadwick v. State, 1 Tenn.Cr. App. 72, 429 S.W.2d 135, in view of Corn's conduct during the King robbery as shown by this record we cannot say that the jury erroneously or improvidently disbelieved him and believed the ladies King and misjudged that issue. He has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict of the jury in that case.

◼ Both Marlowe and Arendall complain that the trial court erroneously overruled Corn's motion for a severance in which they say they joined. But no such motion nor any action of the trial court with reference to a severance appears in the record. Therefore, this question cannot be considered here because of the fundamental rule that appellate courts are precluded from reviewing alleged errors which are not apparent in the record.

Ezell v. State, 220 Tenn. 11, 413 S.W.2d 678; Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105; Roberts v. State, 212 Tenn. 25, 367 S.W.2d 480; Nance v. State, 210 Tenn. 328, 358 S.W.2d 327; Sullins v. State, 1 Tenn.Cr.App. 630, 448 S.W.2d 96.

■ Marlowe and Arendall next contend that the court erred in not declaring a mistrial when Elmer Williams, called as a witness by Corn, testified at first that Marlowe and Arendall stole his shotgun from him on November 6 and later also testified that he was not certain as to the date. However, the record shows that the trial court ordered that Williams' testimony be stricken from the record and instructed the jury not to consider it for any purpose. The error, if any, was thus cured. Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783. There is a presumption that the jury does not disregard the court's instructions not to consider inadmissible evidence. O'Brien v. State, 205 Tenn. 405, 326 S.W.2d 759.

■ There is no merit in the Assignment of Arendall and Marlowe that a picture of Arendall's car in which they were riding when arrested was improperly admitted in evidence because it showed a decal glued to the inside of the rear window bearing the statement "We don't give a shit." The picture shows the rear-end of Arendall's vehicle and the Tennessee license plate bearing no. 2–W 4913. Since Arendall admitted this was his automobile, we can see no particular probative value in the photograph. However, the law has long been established that the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion. Palmer v. State, 1 Tenn.Cr.App. 223, 435 S.W.2d 128; Freshwater v. State, 2 Tenn.Cr.App. 314, 453 S. W.2d 446; Morelock v. State, 3 Tenn.Cr. App. 292, 460 S.W.2d 861; Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911. We find nothing in this record even remotely supporting these defendants' insistence and argument that the decal in question inflamed and corrupted the minds of the jurors to their prejudice.

■ Arendall separately claims the trial court erred in failing to grant his motion to be sent to Central State Psychiatric Hospital before trial for examination. The evidence heard upon that motion is not preserved in the Bill of Exceptions. In the absence of that evidence, quite obviously we cannot pass judgment upon the action of the trial court in overruling the motion. Phipps v. State, Tenn.Cr.App., 474 S.W.2d 154. In the absence of a Bill of Exceptions, the presumption is that the evidence was sufficient to warrant and sustain the verdict. Clark v. State, 214 Tenn. 555, 381 S.W.2d 898. The same principle is clearly applicable here.

Finally, in a letter addressed to a member of this Court, Marlowe raises the contention that he was convicted upon the uncorroborated testimony of an accomplice. Aside from the obstacles confronting his effort to raise the question here for the first time, suffice it to say that the evidence hereinabove delineated refutes that contention completely.

Let the judgments of the trial court be affirmed.

MITCHELL and RUSSELL, JJ., concur.