**George Leonard LEDFORD, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

March 16, 1978.

Certiorari Denied by Supreme Court June 12, 1978.

Tyrus H. Cobb, Gerald R. Grizzell, Shelbyville, for appellant.

Brooks McLemore, Jr., Atty. Gen., Henry E. Hildebrand, III, Asst. Atty. Gen., Nashville, James S. Kidd, Dist. Atty. Gen., Fayetteville, Rondal T. Wilson, Asst. Dist. Atty. Gen., Shelbyville, William N. Lloyd, Special Prosecutor, Lewisburg, for appellee.

DAUGHTREY, Judge.

## OPINION

The defendant-appellant, George Leonard Ledford, was indicted for second degree murder as the result of his wife's death at their rural Marshall County home on the night of May 26, 1976. Upon the defendant's motion, venue was transferred to Bedford County, where Ledford was subsequently tried and convicted by a jury of second degree murder and was sentenced to 30 years imprisonment. On appeal, the defendant raises multiple assignments of error, the most serious of which concern (1) the sufficiency of the evidence to support the verdict, (2) the trial court's failure to grant a mistrial following the prosecutor's comment during closing argument on the defendant's failure to take the stand, and (3) the exclusion of certain entries in the defendant's hospital records. For the reasons set out below, we conclude that the case must be remanded for a new trial.

The factual issues litigated at trial were sharply drawn. It was the State's theory that Ledford shot his wife and then set about to make it look as if the crime had been committed by an unknown intruder. The defense theory was that a burglar had forced open the kitchen door to the Ledford home, and, in some order, murdered Mrs. Ledford, beat Mr. Ledford senseless, and ransacked the house. Ledford, semi-conscious, bloodied and apparently beaten, was found in his kitchen the next morning by a tenant farmer. Whether his wounds were self-inflicted, as the State contended, or were sustained as the result of an assault by an unidentified assailant, as the defendant maintained, thus became the central issue of the trial.

The defendant was hospitalized as a result of his wounds, and, in a statement to police shortly after the homicide, he said that he and his wife had returned from an early evening visit and that he had gone to bed at 9:30 p. m., leaving his wife in the den watching television. He said that he was later awakened by a masked intruder who threatened him and beat him until he lost consciousness. He claimed that he could remember nothing until he came to in the hospital. (An ambulance attendant later testified that Ledford was not unconscious when transported to the hospital, because he was not completely limp; the attending physician, however, described Ledford as "comatose" on his arrival at the hospital.) Ledford maintained in his statement to police that he did not hear any shots fired. Medical testimony indicated that Mrs. Ledford died from two .38 caliber gunshot wounds to the head, either one of which was fatal, both entering near her left ear and exiting through her right ear canal. An autopsy performed on the victim also

turned up a six inch laceration to her scalp, which she suffered prior to her death from the gunshot wounds.

The defendant's brother, Carl Ledford, had himself been indicted and acquitted of murdering his wife prior to the homicide in this case. During those proceedings, Leonard Ledford had been made his brother's conservator, and had subsequently been sued by his brother for an accounting. That lawsuit resulted in a $13,000 chancery judgment against the defendant, which remained unsatisfied at the time of the victim's death in this case. In his statement to police, Leonard Ledford said that before physically attacking him, his assailant demanded to know the whereabouts of the "Carl money". It was the defendant's additional theory that his wife had been killed because her interest in the farm property as a tenant by the entirety was an impediment to the successful execution of a lien against the property in satisfaction of the judgment secured by Carl Ledford.

Although there was no evidence whatever of any ill will between the defendant and his wife, the State made an unsuccessful attempt to show an improper relationship between the defendant and his middle-aged bookkeeper, and then argued to the jury that Ledford's motive in killing his wife was to secure clear title to the farm property.

The State also introduced proof that in early July, some six weeks after the murder and at about the same time the local grand jury was scheduled to meet, the defendant left Marshall County and went to Dayton, Ohio, where he registered at a motel under an assumed name. When no indictment was returned, the Marshall County Sheriff swore out an arrest warrant on July 17, and the defendant was arrested in Ohio and brought back to Tennessee. (An indictment was returned against him the following November.) The State insists that the defendant's conduct amounted to flight and that this circumstantial evidence, together with the fact that he was the only known witness to the murder, is sufficient to sustain the jury's verdict, assuming the jury accept-

ed the State's theory that the defendant's wounds were self-inflicted. The defendant offered no explanation at trial for his so-called "trip to Ohio."

In addition, the State produced three expert witnesses from the F.B.I.'s laboratory in Washington, D. C., who testified concerning tests conducted on some 32 items of physical evidence submitted to them, including wood splinters, hair samples, fingernail scrapings, pillows and other items of furnishing, blood samples, floor scrapings, rug fibers, clothes taken from the victim and the defendant, a .38 caliber gun and six .38 caliber bullets found in the Ledford home, and bullet fragments and slugs involved in the shooting. The resulting testimony was a virtuoso demonstration of expertise, but it produced not a single item of direct evidence tending to inculpate the defendant and only one item of arguably incriminating circumstantial evidence: an expert testified that one of the two bullets which caused the victim's death had the same composition as one of the six bullets found in the Ledford home, from which the expert deduced that the two bullets were probably produced by the same manufacturer out of the same "batch." The manufacturer, however, produces some 16 million bullets a day, according to the expert's testimony.

The murder weapon was never identified.

It is clear that the State's case was built entirely on circumstantial evidence, and we know of no better way to describe it than to say it was an extremely close case at best. There was uncontroverted proof that the Ledfords' kitchen door had been forced open and that the house had been partially ransacked. The police testified that because some drawers had been rummaged while others were left unopened, and because the alleged ransacking in some instances appeared to have been done "neatly," they came to disbelieve the defendant's "mysterious intruder" story. They also concluded that the defendant's wounds were "probably" self-inflicted, theorizing that the defendant had used a twisted coathanger to flail himself on the shoulders and down his back, producing pronounced

red welts so severe as to have the appearance of cuts. The coathanger was introduced into evidence, as was a picture of the defendant's wounds with the coathanger superimposed over one of the welts. While this photograph tends to establish that the wounds were inflicted with the coathanger, it sheds little or no light on the question of who inflicted the wounds. Indeed, although it appears possible that one might be able to hit oneself on the back with the coathanger in question, the very inflexibility of that object would likewise appear to preclude the infliction of wounds as severe and extensive as those depicted in photographs introduced by the State.

Nevertheless, the jury accepted the State's theory and returned a guilty verdict. A review of the evidence suggests to us that the State's circumstantial case probably was not sufficiently strong or cogent enough to rebut every reasonable theory other than the defendant's guilt, which is, of course, the applicable jury standard in a prosecution based solely on circumstantial evidence. But this court does not sit as a jury on appeal, and we must measure the evidence by a different standard, i. e. whether the proof preponderates against the verdict and in favor of the defendant's innocence. *State v. Brown,* 551 S.W.2d 329 (Tenn.1977). Measuring the proof against that standard, we are unable to hold that the judgment must be reversed on the insufficiency of the evidence alone.

However, we are concerned that the jury was influenced in reaching its verdict by certain other errors at trial, and given the relative weakness of the State's case, we are unable to say that these errors did not affect the outcome of the trial. The most serious error involved a comment by the prosecutor on the fact that the defendant did not testify in his own defense.

During the opening segment of the State's closing argument, the following colloquy occurred:

General Kidd: Also, that anything referring to the defendant's statement would be the defendant's statement, of course, that he gave our law enforcement officers here, at that time. And of course, not referring to his failure to testify. Then, or not testifying ____ (Interrupted)

Mr. Cobb: Please the Court, we except to that statement, and move for a mistrial.

General Kidd: Certainly, anything I say ____ (Interrupted)

The Court: One moment, please! Ladies and gentlemen of the Jury: Ignore the statement just made by the District Attorney General. It was an improper statement. He should have known better! No reference at all can be made to the failure of the defendant to testify. He has the Constitutional Right not to testify. It's his decision to make. The burden of proving the guilt of the defendant remains upon the State beyond a reasonable doubt. Alright. Proceed. Mr. Kidd.

General Kidd: We thank, Your Honor, for that.

The Court: Right.

General Kidd: And anything referring to a statement of the defendant is certainly to the one given to the law enforcement officers, and that alone. Because we certainly do not want to violate any Constitutional Rights, or any Rights of the defendant.

The impropriety of any comment upon a defendant's exercise of the Fifth Amendment right not to testify is so well settled as to require little discussion. The United States Supreme Court dealt with the question in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *O'Connor v. Ohio,* 385 U.S. 92, 87 S.Ct. 253, 17 L.Ed.2d 189 (1966); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968), and *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968). Furthermore, Tennessee law provides that the "failure of the party defendant . . . to testify in his

own behalf, shall not create any presumption against him." T.C.A. § 40–2403. *See also* Tenn.Const., Article 1, Section 9. Our Supreme Court has said many times that adverse comment or argument based upon a defendant's failure to testify may be reversible error. *Smithson v. State,* 127 Tenn. 357, 155 S.W. 133 (1913); *Staples v. State,* 89 Tenn. 231, 14 S.W. 603 (1890). *See also Huckaby v. State,* 3 Tenn.Cr. 84, 457 S.W.2d 872 (1970); *McCracken v. State,* 489 S.W.2d 48 (1972). The rule is clear, and, as the trial judge in this case noted, the comment was "improper" and the prosecutor "should have known better."[1]

In *Morris v. State,* 537 S.W.2d 721 (Tenn. Crim.App.1976), this court dealt with a situation very similar to the one now before us. There the prosecutor told the jury, ". . . I'm not commenting on the fact that the defendant didn't take the stand, because that is his God-given right . .." 537 S.W.2d at 723. In holding that this statement resulted in reversible error, the *Morris* court noted that "[s]ometimes it is more effective to get across a message in a negative manner" and held that "in the very telling the jury that he was not commenting on the fact the defendant didn't take the stand, the prosecuting attorney most emphatically was making such comment." 537 S.W.2d at 723.

Having determined that the initial comment constituted error, it next becomes our task to decide whether the cautionary instructions given by the trial judge were sufficient to cure the error so thoroughly as to render it harmless beyond a reasonable doubt. For it was in *Chapman v. United States, supra,* in the context of a violation of the very Fifth Amendment right involved here, that the United States Supreme Court laid down its rule for determining whether or not constitutional error

may be considered harmless in a given case. There the adverse comment by the prosecuting attorney on the defendant's failure to testify was held not to be harmless. According to the *Chapman* court, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828.

Reviewing this record, we do not believe that the standard announced in *Chapman* has been met. We are especially concerned because, taking the improper comment in context, there appears to be absolutely no justification for the prosecution to have done anything more than to identify the statement in question as the one given to police by the defendant. It was totally unnecessary to go farther and attempt to distinguish from a non-existent statement at trial. We believe the attempt to do so makes untenable any "good faith" argument on behalf of the prosecutor.

■ We note also several other disturbing aspects of the prosecution's argument. In its closing segment, the State propounded to the jury what we consider to be a prejudicially erroneous explanation of the reasonable doubt standard, saying, in effect, that if the jury "knows" the defendant is guilty, but *concludes that the State has failed to prove its case,* the jury must nevertheless convict the defendant because the State has actually proved its case—otherwise the jury could not "know" the defendant was guilty. The Assistant District Attorney then closed his final argument by calling on the jury to convict the defendant so that ". . . Leonard Ledford won't be walking the streets like [his brother] Carl." To imply to the jury that they should convict one person in order to make up for what the State considered to be a

---

1. Not only was the remark wholly improper, but the severity of its potentially prejudicial effect was increased by the fact that it was couched in terms of the defendant's *failure* to testify rather than his right not to take the stand. The word "failure" may well have conveyed to the jury the feeling that the defendant was somehow shunning an obligation, morally, if not legally, to take the stand and explain away certain circumstances pointing to his guilt. Unfortunately, the cautionary instruction given to the jury at that time reemphasized this approach, as did the final charge to the jury, wherein the trial judge again spoke of the defendant's "failure" to testify.

wrongful acquittal of another person is, of course, so reprehensible and inflammatory that the prejudicial effect of such an argument can hardly be calculated.

We are doubly concerned with the inflammatory and prejudicial argument in this case because of the wholly circumstantial and rather insubstantial nature of the proof of guilt against the defendant. As we said in *Judge v. State*, 539 S.W.2d 340, 346:

> While the evidence here preponderates in the State's favor on appeal, this case was a very "close" one at trial when viewed by the reasonable doubt standard. Therefore, the prejudicial impact of the statement on the jury is likely to have been greater than it would have been had evidence of the defendant's guilt been overwhelming. (citations omitted).

Finally, in determining that the improper argument in this case cannot be viewed as harmless beyond a reasonable doubt, we note also that there is another error in this record which may have had a cumulative effect on the jury's verdict. In ruling on the admissibility of the defendant's hospital records, the trial court deleted several entries at the State's request, apparently on the ground that they called for an opinion which the recording nurse and physician were not qualified to give. Among these notations were the following entries: "badly beaten [by what app'rs 2½ " belting c̄ metal tipping:' "voided [urine] involuntarily"; "states fainted at funeral home"; "due to attack"; "apparently beaten."

■ We recognize the discretion of the trial judge to exclude from hospital record "any portions which are objectionable." *Graham v. State*, 547 S.W.2d 531, 538 (Tenn. 1977). But under the *Graham* decision the "*qualifications* of the individual preparing the record may be inquired into, may be challenged, or may be disputed but this goes to weight and not to admissibility."

547 S.W.2d at 538. We think it is clear that most of the excluded entries should have been presented to the jury, for whatever probative value they may have had.[2] The one exception is the notation "States fainted [at] funeral home," which on its face constitutes double hearsay and, therefore, must satisfy some exception to the hearsay rule beyond the business records exception in order to be admissible. E. Cleary, *McCormick on Evidence*, § 313 (2d ed. 1972).

We thus conclude that the assignments of error related to the prosecutor's improper argument and the admissibility of the hospital records must be sustained. We are of the further opinion that the error involved was such as to deprive the defendant of a fair trial, and that the case must be remanded for retrial.

■ The defendant's two remaining assignments of error require only brief mention. The trial court did not err in admitting the photograph of the defendant's body with the twisted coathanger, later introduced into evidence, superimposed over one of the wounds. The photograph was relevant and not inflammatory, and it was therefore admissible. Furthermore, the trial court's instruction on the law of tenancy by the entirety, while somewhat unique in a criminal trial, was not erroneous per se and covered a legal issue which had been raised by both parties to the lawsuit. However, if a similar instruction is given upon retrial, we suggest that it be carefully worded so as to avoid any possible implication that it constitutes a comment on the evidence by the trial judge.

The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

DWYER, P. J., and RUSSELL, J., concur.

2. This is particularly true since it appears that the redacted exhibit as it went to the jury included several entries based on opinion of the same nature as those excluded, and thus were equally objectionable. It further appears that only the ones helpful to the defendant were excluded, a process which may well have violated the defendant's right to a fair hearing. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

DWYER, Presiding Judge, dissenting.

I am in respectful disagreement with my colleagues as to the remand of this record. If one fact was apparent in this homicide trial to all, and in particular to the jury, it was the fact that appellant did not testify. Whether comment is made or not on this fact, that fact is and was apparent to the jury. In short, our law prohibits such comments by the attorney general; however, counter-balancing of such error must under our law be obtained through immediate curative instructions by the court.

While I cannot condone nor pardon the attorney general for venturing either directly or indirectly into this forbidden territory, I cannot say that his error was prejudicial under the facts and circumstances found in this record. There is a line of authority in this State that holds when an objection is made and sustained coupled with prompt instructions the error is cured. *Hambrick v. State*, 181 Tenn. 544, 181 S.W.2d 957 (1944); *Williams v. State*, 218 Tenn. 359, 403 S.W.2d 319 (1966); *Huckaby v. State*, 3 Tenn.Cr. 84, 457 S.W.2d 872, 875 (1970); *French v. State*, 489 S.W.2d 57, 60 (Tenn.Cr.App.1972); *King v. State*, 1 Tenn. Cr.App. 137, 430 S.W.2d 810 (1968); *Buchanan v. State*, 2 Tenn.Cr. 398, 454 S.W.2d 178, 182 (1970); *Squires v. State*, 525 S.W.2d 686, 694 (Tenn.Cr.App.1975); *Tooley v. State*, 1 Tenn.Cr. 652, 448 S.W.2d 683, 687 (1969). Or, more adroitly stated in *Morrison v. State*, 217 Tenn. 374, 390, 391, 400 S.W.2d 239 (1966):

". . . We must conclude that the jury made up of citizens of high intelligence, fair minded men and women, and jurors who adhere to the rulings of the court, because the court has their respect, were told and knew that they use the court as a witness as to what the law is and more or less should and do take the law as given them by the court. The court is their witness as to what this is; they have respect for him and *heed what he says.* This being true, when these questionable questions are asked, objections sustained to them and the jury told not to consider them, this clearly is non-

prejudicial and is no basis for a reversal." (Emphasis added.)

There is a presumption of law that a jury does not disregard the court's instructions not to consider inadmissible evidence. *Howard v. State*, 501 S.W.2d 573 (Tenn.Cr. App.1973), accord, *Klaver v. State*, 503 S.W.2d 946, 950 (Tenn.Cr.App.1973). In *O'Brien v. State*, 205 Tenn. 405, 418, 419, 326 S.W.2d 759, 765 (1959), the following may be found:

". . . the court instructed the jury to disregard any question about anything which may have affected a jury in a former trial. As far as the record shows this ended the matter until the motion for new trial was filed. We think of course that we cannot assume that the jury considered the evidence to the prejudice of the plaintiff in error and we certainly cannot say that the *jury disregarded the instruction of the trial judge. The fact of the matter is all presumptions are to the contrary.*" (Emphasis added.)

Conjunctive with the previous cited cases, there is another line of authority that holds despite curative instructions of the trial court, the reviewing court must weigh the complained of evidence in the context of the whole record. That if there is doubt as to its prejudicial impact, that doubt must be resolved in favor of the appellant. *Blankenship v. State*, 219 Tenn. 355, 410 S.W.2d 159 (1966), in accord, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Huffman v. State*, 3 Tenn.Cr. 124, 458 S.W.2d 29 (1970). Further, this court has indicated that sustaining defendant's objection and curative instructions may not always result in automatic cure; reasoning that additional steps, such as admonishing the prosecutor, may be necessary to remove prejudice. *Judge v. State*, 539 S.W.2d 340, 345, 346 (Tenn.Cr.App.1976). Accordingly, in this case the trial judge sustained defendant's objection, issued immediate curative instructions, and admonished the prosecutor thus removing any resultant prejudice.

With the above in mind I note the majority has found the convicting evidence to be

sufficient and with the jury not assessing the maximum punishment, I think the error was harmless.

A review of the United States Supreme Court decisions supporting the majority reversal: *Griffin v. United States,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Chapman v. California,* supra; *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968) reveals that the comment on defendant's failure to testify was sanctioned by the California State Constitution, as follows:

> Art. I § 13: "In any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury."

Due to the evident disparity of applicable law of California and Tennessee, the application of these cases to the instant case is questionable. The above cited United States Supreme Court cases as well as *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968), reveal that, unlike here, the court charged the jury that inferences of guilt could be inferred from the failure of the defendant to testify coupled with the prosecutor's reliance on such a charge resulting in a free-swinging argument filled with remarks concerning the inferences to be drawn when the defendant did not testify. The prejudice which resulted in those cases is a far cry from the innocuous comment of the attorney general here, and quickly cured by the trial court.

As stated in *Anderson v. Nelson,* supra, this error cannot be harmless when: (1) there are extensive comments of the failure to testify; (2) when guilt is stressed by that silence as a basis of conviction; and (3) where there is evidence that could have supported acquittal. There were not extensive comments here and no stressing of guilt by defendant's silence and the majority has found the evidence of guilt to be sufficient.

I would, in conclusion, hold that the comment by the attorney general which prompted an objection with resulting curative instructions and reiteration of that instruction to the jury in its charge cured any error. In short, the error was harmless beyond a reasonable doubt. In other words, with reliance on the prompt instructions given by the court coupled with his charge of law not to draw any inference from the appellant's failure to testify I have no hesitation in holding and believing under our system of law that the jury of fair-minded citizens sworn to give this appellant a fair trial accepted the rebuke of the Attorney General by the court and heeded the prompt instructions of the court. While I have expressed myself that the error was harmless beyond a reasonable doubt, I must also relate that I have qualms about this "reasonable doubt" rule of *Chapman v. California,* supra, in this record. First, the jury has found beyond a reasonable doubt that the appellant was guilty. The appellate court evaluates that in the light of whether the evidence preponderates against his guilt and in favor of his innocence. Second, in *Chapman v. California,* supra, with the Constitution of California permitting inferences to be charged and permitting the prosecutor to have a free-swinging argument on defendant's failure to testify, I can understand why an appellate court before holding that type charge and argument harmless error must do so by expressing it was not prejudicial beyond a reasonable doubt. Third, our State Constitution contains no such provision, our trial court made no such type charge, the prosecutor made no such type argument. Fourth, with the court rebuking the prosecutor, promptly charging not to consider it to the jury with further instructions in his charge I have a serious doubt that I must, under those circumstances, use the "reasonable doubt rule" of *Chapman,* supra, to say the error was harmless; nevertheless, as stated, I am satisfied that the single comment was not prejudicial error. In passing, to hold as the majority would preempt curative instructions and every inadvertent or questionable statement of the prosecutor would be an automatic reversible error.

The other segment on the prosecutor's argument about reasonable doubt (the court's charge amply explained this necessary question of proof that the State must meet before they could return a verdict of guilty) and the portion of that argument concerning appellant's brother walking the streets (there was evidence that his brother had been acquitted of killing his wife and appellant's statement reflected that he felt his brother was guilty), not being objected to there is no error. *Sherman v. State,* 125 Tenn. 19, 47, 140 S.W. 209 (1911); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Casone v. State,* 193 Tenn. 303, 246 S.W.2d 22 (1952); *Staggs v. State,* 210 Tenn. 175, 357 S.W.2d 52, 55 (1962).

Lastly, the majority holds the court erred by excising portions of the hospital records, as follows: "due to attack"; "apparently beaten"; "badly beaten"; "voided involuntarily". I find no error in the court excluding the "opinions" of witnesses who were not properly qualified. *Covey v. State,* 504 S.W.2d 387, 392 (Tenn.Cr.App.1973). Admittedly, the hospital record is admissible when offered as here by the qualified keeper conforming to the mandates of T.C.A. 24–714; however, admissibility of statements contained therein is not solely authenticated in this manner. Opinion, conclusion and other objectionable statements may properly be excised either in whole or in part as here according to other recognized rules of evidence. *Graham v. State,* 547 S.W.2d 531, 538 (Tenn.1977). There was, I think, no abuse of discretion by the trial court in excising the objectionable terms from those records.

I would affirm this conviction.