IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. TYRAIL JERMAINE COOKE

**Appeal from the Criminal Court for Knox County**
**No. 100543     Scott Green, Judge**

_____

### No. E2017-00781-CCA-R3-CD

_____

Aggrieved of his convictions of reckless homicide and aggravated child abuse, the defendant, Tyrail Jermaine Cooke, appeals. In this appeal, the defendant argues that the trial court erred by refusing to suppress the entirety of his pretrial statement to the police; that the trial court erred by admitting into evidence the video recording of his pretrial statement; that the trial court erred by admitting into evidence photographs, testimony, and other evidence relating to bruising in the victim's genital area and a hole in the wall in the closet of the defendant's residence; that the trial court erred by refusing to grant the defendant's request for a special jury instruction regarding the right of parents to use corporal punishment to discipline their children; that the trial court erred by denying his motion for a mistrial based upon the prosecutor's improper comment on the defendant's right to remain silent during his closing argument; that the evidence was insufficient to support his convictions; that the 29-year effective sentence is excessive; and that the cumulative effect of the errors deprived him of the constitutional right to a fair trial. Because we discern no reversible error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark E. Stephens, District Public Defender (on appeal and at trial); Jonathan Harwell, Assistant District Public Defender (on appeal and at trial); and John Halstead, Assistant District Public Defender (at trial), for the appellant, Tyrail Jermaine Cooke.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Christopher Rodgers and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

In November 2012, the Knox County Grand Jury charged the defendant with one count of aggravated child abuse and one count of felony murder in the perpetration of child abuse related to the October 2012 death of five-year-old R.R.[1]

The evidence adduced at the defendant's March 2015 trial established that the victim's mother left the defendant, her live-in boyfriend, alone with her three children on the morning of October 20, 2012, while she went to run errands. At some point, the defendant telephoned to say that he could not rouse the victim, and, upon returning to the apartment, the victim's mother found him unresponsive in his sister's bedroom. The victim was transported to the hospital, where he succumbed to his injuries three days later.

The victim's mother, A.R., testified that she had been dating the defendant for three or four months in October 2012 and that the two had moved into an apartment with her three children, ages six, five, and three, 11 days before the incident that led to the victim's death. On October 20, 2012, she woke the children, fed them breakfast, and put a movie on for them to watch. She then woke the defendant and asked him to "just to listen for" the children while she and a friend ran errands. She and the defendant exchanged several text messages, and, at one point, she returned to the apartment to give the defendant some cigarettes. At that point, all three children appeared normal. She then left a second time to finish her errands. Just before returning home, she telephoned the defendant to check on the children and ask if they needed anything. The defendant indicated that all was well.

"About two minutes" later, the defendant called her back to tell her "that there's a problem . . . where he can't wake [the victim] up." The defendant told her that the victim had soiled his pants and that when the defendant took him into the bathroom to change him, the victim "had fallen and hit his head." The defendant said that "he woke [the victim] up the first time and that he had passed back out, and he tried putting him in the bathtub and he'd hit his head again in the bathtub." She "rushed straight there" and arrived "within like two minutes after the phone call." She recalled that when she arrived, the defendant and her other two children were "in the master bedroom" "playing the X-box." The victim "was in the front room laying on the toddler bed with the door closed. He just closed him up in there." When she picked the victim up and carried him into the living room, "his eyes were rolled in the back of his head and his mouth was quivering." She screamed for help from her friend, who was still outside, and she "started trying to give him CPR." She telephoned 9-1-1, but her friend had to speak to

---

[1] As is the policy of this court, we refer to the minor victim by his initials.

the operator. She said that the defendant "came in there and tried to explain . . . then he changed the story, said [the victim] was jumping on the bed and hit his head on the window sill."

Knoxville Fire Department paramedic Cory Darnell responded to the residence. When Mr. Darnell arrived, he saw the victim lying on his back just inside the front door and observed a black male "standing toward the back of the front room observing." The victim was unconscious and "not breathing adequately." Because the victim's airway was obstructed by "blood and airway secretions," medical personnel "had to suction" the airway and intubate the victim. He said that they used a bag valve mask to breathe for the victim but that they "had a difficult time keeping [the victim] intubated."

Doctor Marymer Perales, who was declared an expert in the diagnosis of child abuse and trauma, testified that she was called by the emergency room physician who had initially examined the victim at East Tennessee Children's Hospital. When she arrived, she saw "a very critical patient who required assistance to breathe, . . . medicines to have his blood pressure stay stable, and monitoring of . . . how much pressure was around his brain at all times." Doctor Perales testified that she "performed a limited physical examination of the child because this child was so sensitive to any movement or even sound that we had to whisper in front of him." She said that even small movements would increase the victim's blood pressure, causing an increase in the intracranial pressure. For that reason, she did not turn the victim over to examine his back or the back of his head. Doctor Perales testified that imagining tests "showed that the patient had what we call occipital fracture" and "extraaxial fluid," or "fluid that is between the brain and the skull." The victim actually had fluid between all the layers of his brain and skull and "even had bleeding between the bone and the scalp." He also suffered a "whiplash like" injury to his brain and a rupture of his cervical spine.

In addition to these injuries, the victim "did have a bruise over his left eyelid that was around the face" and "a laceration in the back of his head" that she never saw because she was unable to move him. The victim had bruising to the skin above the penis, "some swelling to the scrotum," and bruising around the penis. Doctor Perales testified that "you'd have to have blunt trauma to that area to get a bruise there" and opined that a fall would not have caused the bruising because the victim lacked the "mass to create that much of force to have this much bruising present." Instead, "[h]e would have to have been slammed or thrown."

Doctor Perales testified that the injuries to the victim's skull and brain would have required "a great amount of force. . . . A force that if someone were to witness that event, they would know that that child was injured." She opined that the

-3-

victim's injuries "were inflicted nonaccidental trauma" and testified that the injuries could not have been caused by the victim's fainting in the bathtub or his falling backwards onto a carpeted floor. She also testified that the injuries could not have been caused by the victim's hitting his head on the window sill while jumping on the bed, explaining, "We see a lot of that in the emergency room, and these are not the injuries that you would see with a child who is jumping on a mattress and hits his head on a window sill." She added that the fact that the back of the victim's skull was fractured also suggested that he did not injure himself in a fall, explaining, "[F]rom the back of the head tells me one, there was a lot of force, and two, that it's probably more concentrated to that area. And then the fact that he had swelling outside that area also confirms that that's where the hit occurred." Doctor Perales testified that she could fathom no scenario under which the victim could have caused the injuries to himself because the force required for the injuries would be similar to "a car accident, forces equal to falling from a great height like skydiving; a lot of force." After receiving the injury, the victim would have been unable to carry on a conversation or walk unassisted and, if he had a lucid interval, it would not have lasted "very long at all."

Officer Rachel Warren of the Knoxville Police Department ("KPD") forensics unit photographed and collected evidence at the apartment. Among the items she collected were towels found inside the washing machine that had "a reddish brown substance" on them and samples from the carpet and drywall in the master bedroom closet that also exhibited reddish brown stains.

KPD Investigator Phyllis Tonkin also responded to the scene, where she and KPD Investigator Brian Moran interviewed several witnesses, including the defendant.[2] After Investigator Moran provided the defendant with *Miranda* warnings, the defendant "voluntarily agreed to do a walk-through of the residence to show what had occurred earlier that morning." The defendant was then transported to the police station. Investigators Tonkin and Moran traveled to the police station less than two hours later to interview the defendant. A video recording of the defendant's statement was played for the jury.[3]

During the interview, the defendant conceded that the victim's mother had left him alone with the children on the morning of October 20, 2012. He said that after she woke him, he went back to sleep for a period of time before getting up to play video games. He admitted that he did not check on the children. At some point, the oldest child came into the room to ask for water, and the defendant told him to "get some water out of the bathroom." Sometime later, the same child came into the room to report that

---

[2]    Investigator Moran was unavailable at the time of the defendant's trial.

[3]    As will be discussed more fully below, the video recording played for the jury was heavily redacted to comply with the trial court's ruling on the defendant's motion to suppress.

the victim was "messing with this." The defendant told the victim to come into the room, and the victim complied. The victim began watching the video game that the defendant was playing, and the defendant asked the victim if he was "being bad." The victim replied that he was not. The defendant "started smelling something," and realized that the victim had soiled himself. The defendant said that he "turned him around, he turned right back around" and that when he pulled the victim's pants down, the victim "passed out." The defendant said that he did "everything [he] could" to get the victim to "come back and focus." He said the victim eventually "stood up," "walked like two steps," and told the defendant that he was okay. The defendant then put the victim into the bathtub and went to get a towel. The defendant said that while he was out of the room, he heard "a loud boom." He found the victim "in the tub laying down." He claimed that when he picked the victim up, there was "foam and stuff" coming from the victim's mouth. The defendant said that, at that point, he telephoned the victim's mother. He then carried the victim in a towel to his sister's bedroom. The defendant said that the victim "wasn't breathing at all" when the defendant carried him into the bedroom. He said that he attempted to provide cardiopulmonary resuscitation to the victim.

When officers told the defendant that the victim's injuries could not have been caused by his falling in the bathtub, the defendant said that he had "done a lot while he was passed out" trying to revive the victim, saying that he had shaken the victim and "pushed down hard as hell" on the victim's chest. He said that when he pressed on the victim's chest, blood came out of the victim's mouth.

The defendant claimed that the victim had red marks and "big old knots" on his head where his older brother had "busted his head." Eventually, the defendant acknowledged that he pushed the victim and then the victim "bumped his head on the dresser." He said that he pushed the victim with one hand and that the victim "got back up" after hitting his head. He said that the back of the victim's head struck the broken corner of the dresser.

Tennessee Bureau of Investigation Agent and Forensic Scientist Kim Lowe testified that forensic testing established the presence of the victim's blood on a towel found in the washer and the defendant's blood on a towel found in the bathroom. Testing of a sample of drywall cut from the master bedroom closet indicated the presence of blood but "failed to indicate the presence of human hemoglobin, a component of human blood," and "further tests indicated the presence of human DNA but due to the limited information obtained, nothing can be interpreted." Agent Lowe opined that the stain on the drywall "probably is not human blood" and that the presence of human DNA "could be from someone simply touching the wall." In addition, the stain on the carpet from the master bedroom closet was not blood.

Two calls placed by the defendant while he was incarcerated in Knox County were played for the jury. In one call, the defendant acknowledged that the victim had been acting up, complained that he was forced to take care of the children because their mother would not, and said, "I put my hands on a little kid."

Chief Deputy Medical Examiner for Knox County Christopher Lochmuller conducted the autopsy of the victim's body. Doctor Lochmuller testified that the victim had "a large area of bruising . . . under the skin up against the skull" and "on the back side of the right side of his head." "[T]here was an area of skin that had been partially torn" behind the victim's left ear. "The underlying portion" of the victim's skull "ha[d] a complex fracture," and "[t]he brain itself [was] severely to markedly swollen," causing "herniation which is an indication you're getting close to death." Doctor Lochmuller also observed "three bruises on the front of the brain. . . where the brain got pushed into the other side of the skull" and bruising on the brain stem "very close to the upper cervical spinal cord." Doctor Lochmuller observed "an area of hemorrhage along the right side of the upper aspect of the cervical spine" as well as "some hemorrhage around the spinal cord itself," which would have caused paralysis from the neck down, affecting the victim's ability to move and breathe. He explained that "the injury to the upper cervical cord is what likely . . . would have caused him to stop breathing and why he's in cardiac arrest at the . . . scene." The head injury would have caused "compression on the brain and eventual swelling and herniation, but that cord injury, in and of itself, would have been enough, but you add that to the brain – the two together are the most significant injuries." He said that the skull fracture alone "may have been survivable . . . but then you never know."

Doctor Lochmuller observed "a discontinuous bruise sort of on the lower aspect of the abdomen that's also . . . extending onto the right side of the scrotum." He said that these injuries "didn't really contribute to [the victim's] death and they're not pattern, so I can't match them up with a weapon. It is an area that if kids are playing could be injured." Doctor Lochmuller did not think the bruising to the abdominal area and the head injuries occurred from the same blow but would instead "have to have been a separate blow."

Doctor Lochmuller testified that it was possible that "a single impact could have caused the skull fracture, the bleeding around the brain and the injury to the neck . . . one moment caused that totality of injury," but he emphasized that the injuries were "not something that would occur from a standing height." He said that although it was theoretically possible that the injuries could have been sustained from the victim's hitting his head while jumping on the bed, it was "not likely." A person with injuries like those suffered by the victim would not have been able to stand up and carry on a conversation. He testified that the victim's injuries could not have been caused by the victim's falling

-6-

backwards onto a carpeted floor or fainting in a bathtub. He said that "if an adult pushed a child as hard as they could into a dresser, maybe you could sustain that injury, but . . . it would have to be a very significant shove." He said that there were "at a minimum two separate impacts, possibly three" to the victim's head "but the two other ones are more minor compared to the one that's associated with the skull fracture." He said that, given the areas of bruising that were "distinctly separate on the scalp," "[i]t would have been difficult to have had them all happen with one impact."

After a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof. Based upon the evidence presented by the State, the jury convicted the defendant as charged of aggravated child abuse but convicted him of the lesser included offense of reckless homicide in lieu of the charged offense of felony murder in the perpetration of aggravated child abuse. Following a sentencing hearing, the trial court imposed a sentence of 25 years' incarceration for the aggravated child abuse conviction, to be served at 100 percent by operation of law, and a sentence of four years' incarceration for the conviction of reckless homicide, to be served at a 30 percent release eligibility percentage. The court ordered that the sentences be served consecutively, for a total effective sentence of 29 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by this timely appeal. On appeal, the defendant challenges the trial court's rulings with regard to the admissibility of his video recorded statement to the police, the admission of certain other evidence, and the defendant's motion for mistrial. He also challenges the sufficiency of the convicting evidence and the propriety of the sentence.

*I. Suppression*

Prior to trial, the defendant moved the trial court to suppress the pretrial statement he provided to Investigators Tonkin and Moran at the police station. He alleged that his statement was inadmissible because the investigators had failed to provide him with *Miranda* warnings at the police station, that the oral waiver of his constitutional rights was not knowing and voluntary, that the investigators had not scrupulously honored his request to end the interview, and that, ultimately, his statement was not voluntarily given because the investigators had overborne his will with belligerent questioning.

At the hearing on the defendant's motion, Investigator Tonkin testified that Investigator Moran provided *Miranda* warnings to the defendant while they were all still at the apartment where the offenses occurred. The defendant, who had been placed under arrest pursuant to an outstanding warrant from Blount County, waived his rights and agreed to not only speak to the investigators but also lead them on a tour of the premises

-7-

while offering an explanation of what had occurred. The initial encounter with the defendant wherein Investigator Moran provided the *Miranda* warnings and the defendant agreed to talk was audio recorded. Officer Warren captured a video recording of the defendant's leading the investigators through the home. Following the tour, the defendant was transported to the police station while Investigators Tonkin and Moran remained behind at the residence to complete their parts of the investigation there.

Less than two hours later, Investigators Tonkin and Moran went to the police station to question the defendant. Rather than provide the defendant with the *Miranda* warnings a second time, Investigator Moran reminded the defendant of the earlier admonition and asked the defendant if he recalled the warnings. Although the transcript of the video recorded interview indicated that there was no audible reply, Investigator Tonkin testified that she recalled the defendant's saying that he did, in fact, recall the warnings. She said that the defendant provided verbal assent to the questioning and that he was not asked to sign a written waiver of rights form.

Investigator Tonkin said that during the interview, Investigator Moran asked most of the questions and that Investigator Moran told the defendant that the victim suffered injuries that the victim did not actually suffer, but she said that "that's what [she and Investigator Moran] were told" by hospital officials. She agreed that Investigator Moran questioned the defendant strongly about alleged evidence of sexual abuse that proved to be not actual proof of abuse at all. She also agreed that Investigator Moran appeared at times to be rather agitated during the interview.

Investigator Tonkin conceded that at one point approximately one-third of the way into the interview, while he was being questioned about the alleged sexual abuse, the defendant said, "'Put it like this, you can leave right now because I ain't got nothing else to say about that. I'm so blunt when I say that.'" She said that she did not believe this statement to be an indication that the defendant wanted to stop the interview but that he merely wanted the investigators to stop asking him about the sexual abuse allegations. For this reason, they continued to question the defendant. She admitted that they continued to ask the defendant questions about the alleged sexual abuse even after his declaration. Investigator Moran also conceded that Investigator Moran did shout at the defendant and make the defendant wait until the end of the interview to have a cigarette.

At the conclusion of the hearing, the trial court took the motion under advisement and noted that it would watch the video recorded statement in its entirety prior to issuing a ruling. On the following day, the court reconvened the parties to discuss the issue. At that point, the State conceded that when the defendant said "you just leave right now," he intended to invoke his right to remain silent and that the investigators had not honored the invocation. The State agreed that it would not use any

-8-

portion of the defendant's statement beyond that point. The trial court accepted the State's concession and agreed that the defendant's statement was an invocation of his right to remain silent.

The court deemed the remainder of the statement admissible, concluding that the defendant "was sufficiently advised of his *Miranda* warnings at the apartment" and that "he sufficiently waived those warnings." The Court held:

> I don't believe that there had to [be] a separate invocation and advisement of his rights and subsequent waiver once he reached the police station, because the record reflects that that was a very short period of time afterwards. And the Court specifically found that there was not a voluntariness problem.
>
> So from page 57 the line that I just read forward, [the defendant's] statement is suppressed. . . .
>
> . . . . There is one other part of this statement that I'm going to permit. . . . [T]here is a period of time when Investigator Tonkin and Investigator Moran both leave the interrogation room, but the cameras are still rolling, and [the defendant] talks to himself and makes some statements which are not responsive to interrogation, he's simply setting there talking to himself and lamenting some decisions that were made. That is still admissible. It's not in response to interrogation. . . .

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states

through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determine–a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting Kelly, 603 S.W.2d at 728 (internal citation and quotation marks omitted)). Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544–45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was

uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained." *Blackstock*, 19 S.W.3d at 208.

On appeal, the defendant concedes that Investigator Moran provided him with *Miranda* warnings before questioning him at the residence but argues that the investigators should have readministered the warnings before questioning him at the police station.

"A valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006) (citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982)). "Courts must examine the totality of the circumstances to determine whether renewed warnings are required." *Id.* The circumstances to be examined include but are not limited to

> 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights.

*Id.*

In our view, there is no merit to the defendant's claim. He was administered *Miranda* warnings at the residence and then, after giving the investigators a tour of the home, he was transported directly to the police station. Less than two hours later, the same two investigators arrived to question him. Before questioning the defendant, Investigator Moran reminded the defendant of the earlier warnings and asked the defendant if he remembered them. The defendant indicated that he did. Neither the change in location nor passage in time was sufficient, in our view, to require a fresh set of *Miranda* warnings.

The defendant also argues that because the investigators failed to readminister the *Miranda* warnings before questioning him at the station, the State cannot

establish that the defendant provided a voluntary waiver. We disagree. We have previously concluded that the police were not required to provide *Miranda* warnings to the defendant at the police station because they had already provided them to him a short time earlier at the residence. The defendant concedes that he voluntarily waived his rights at the residence; we see no reason to conclude that his waiver had expired when the questioning continued at the police station. Even if we had so concluded, however, we would still conclude that the defendant knowingly and voluntarily waived his rights at the police station. Investigator Moran reminded the defendant of the earlier admonition and asked if the defendant recalled it. The defendant indicated that he did and immediately began answering questions.

## II. Admission of Video Recording of Defendant's Statement

The defendant asserts that the trial court erred by admitting into evidence the video recording of his statement to Investigators Tonkin and Moran because the recording contained the hearsay statements and "prejudicial insults" delivered by Investigator Moran. The State contends, as it did at trial, that Investigator Moran's statements did not qualify as hearsay because they were not offered for the truth of the matter asserted.

At trial, the trial court agreed with the State's position and overruled the defendant's objection. Just prior to the playing of the defendant's video recorded statement, the court offered a curative instruction to the jury:

> Ladies and Gentlemen, a couple of points about what you're getting ready to see. You're going to see an interview of [the defendant] conducted at the Knoxville Police Department. I'm informed that this . . . thing may not flow smoothly, it may jump around a lot. I don't want you to be concerned about that. Blame me for that, okay?
>
> Secondly, there will be times when there may be assertions made by Detective Moran in this interview. I'm instructing you now, don't take those assertions as the gospel, okay? I want you to look at the proof that you hear from this witness stand in conjunction with whatever exhibit that's introduced. That's the proof in the case that you're gonna decide the case on. For instance, if Detective Moran makes an assertion that this child may have been hurt in the following ways, that's not necessarily something that you should take as fact at that point in time, okay? Am I clear?

-12-

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

As our supreme court recently confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*. The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions–whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule–are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

In our view, the trial court did not err. The State did not offer any of Investigator Moran's statements for their truth, and the trial court's instruction ensured that the jury would not consider them as such. Moreover, it is our view that the cross-examination of Investigator Tonkin, which demonstrated that Investigator Moran's statements were part of his strategy to get the defendant to make a statement, and the trial court's instruction provided appropriate context to the investigator's statements. Under these circumstances, we see no reason why the trial court should have excluded the evidence.

### III. Other Evidentiary Challenges
#### A. Bruising

The defendant asserts that the trial court erred by admitting evidence regarding bruising on the victim's genital area, arguing that the evidence was irrelevant and prejudicial because there was no proof that the victim received those injuries contemporaneously with the injuries that caused his death. The State contends that the

evidence was relevant and admissible given that the defendant was charged with aggravated child abuse and because nothing limited proof on that charge to the injuries that caused the victim's death. We agree with the State.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Here, the defendant was charged with aggravated child abuse, which required the State to establish that the defendant "knowingly, other than by accidental means," treated the victim "in such a manner" that "result[ed] in serious bodily injury to the" victim. T.C.A. §§ 39-15-401(a); -402(a)(1). "'Serious bodily injury to the child' includes, but is not limited to . . . injuries to the skin that involve severe bruising . . . ." *Id.* § 39-15-402(d). Evidence that the five-year-old victim suffered extensive bruising to his lower abdomen and genital area was highly relevant to the charge of aggravated child abuse, regardless of whether those injuries contributed to the victim's death. As a result, the trial court did not err by admitting the evidence.

### B. Hole in the Wall

The defendant also asserts that the trial court erred by admitting into evidence a portion of the drywall from inside the master bedroom closet when no evidence linked the hole to the assault on the victim and when the State could not even establish that stains on the wall were human blood. The State contends, again as it did at trial, that the fact that there was a hole in the wall in the same closed area where the victim suffered the very significant injuries that led to his death was relevant. The State

also asserts that the fact that the stains on the wall were not human blood went to the weight of the evidence rather than its admissibility.

Officers examining the apartment after the victim was taken to the hospital found a hole in the drywall inside the master bedroom closet. There were also reddish-brown stains on the same portion of the wall. Officer Warren collected the drywall and sent the stained portion to the TBI for testing. As Agent Lowe explained to the jury, that testing indicated the presence of blood but "failed to indicate the presence of human hemoglobin, a component of human blood." Based upon this finding, she concluded that the stain "probably is not human blood" and that the presence of human DNA on the drywall "could be from someone simply touching the wall." Because this evidence did not tend to make the existence of any fact of consequence more or less probable, it was irrelevant. Given the overwhelming proof of the defendant's guilt, however, we conclude that the erroneous admission of the evidence was harmless.

### IV. Special Jury Instruction

The defendant next contends that the trial court erred by denying his request for a special jury instruction on the right of parents and guardians to use corporal punishment when disciplining children.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. 1, § 6; *see State v. Bobo*, 814 S.W.2d 353, 356 (Tenn. 1991); *Willard v. State*, 130 S.W.2d 99, 100 (Tenn. 1939). This right encompasses the defendant's right to a correct and complete charge of the law. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. Jury instructions must, however, be reviewed in the context of the entire charge rather than in isolation. *See Sandstrom v. Montana*, 442 U.S. 510, 527 (1979) (Rehnquist, J., concurring); *see also Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."); *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

Although the defendant may request special instructions, jury instructions are sufficient when they adequately state the law. *State v. Gilley*, 297 S.W.3d 739, 766 (Tenn. Crim. App. 2008). When a trial court's charge to the jury is complete, it need not

give additional special instructions requested by the defendant.  *Id.*; *see also State v. Story*, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

We need not tarry long over the defendant's claim because the instructions provided by the trial court contained a complete and correct statement of the law and because the evidence adduced at trial did not support the giving of a special instruction on a parent's right to use corporal punishment.  As the defendant concedes, "there is little law" on the subject of a parent's right to use corporal punishment as discipline.  Justice Birch, in a concurring opinion, suggested a potential jury instruction to be given when fairly raised in child abuse cases, *see State v. Toliver*, 117 S.W.3d 216, 233 (Tenn. 2003) (Birch, J., concurring), but neither our supreme court nor our legislature has seen fit to adopt such an instruction in the intervening 15 years since Justice Birch made his suggestion.  It is telling that the defendant has not cited a single case where such an instruction was given or where the failure to give such an instruction was identified as error.  Even if a standard instruction on this issue existed, it is not clear that the trial court would have been required to provide it in this case.  Importantly, no evidence suggested that the defendant had been given permission by the children's mother to provide any form of discipline, much less physical discipline, to any of the children.  Additionally, in his statement, the defendant repeatedly insisted that he did not injure the victim in the course of disciplining him.  Finally, the testimony from both Doctor Perales and Doctor Lochmuller established that the victim's injuries were far in excess of what could have happened in the course of reasonable discipline.  Consequently, the trial court did not err by refusing to provide the defendant's requested instruction.

### V.  Closing Argument

The defendant asserts that the trial court erred by refusing to grant his request for a mistrial after the prosecutor improperly commented on the defendant's constitutional right to remain silent.

During the rebuttal portion of the State's closing argument, while discussing the evolving nature of the defendant's explanation of how the victim came to be injured, the following exchange occurred:

> Prosecutor:          I don't know what happened in that bedroom; he does.  He doesn't want to tell us.
>
> Defense counsel:     Objection.

> Prosecutor:        I meant in his statement.  I'm sorry, I'll clarify.  In his statement, he did not want to tell what happened in that bedroom.  He did not want to talk about it.

At the conclusion of the State's argument, the defendant moved for a mistrial on grounds that the prosecutor had made an improper comment on the defendant's right to remain silent.  The trial court denied the motion:

> I think he clarified that.  I note your motion, but I think it was clarified.  I don't think - - certainly, I'm not gonna find that there was any malicious intent on his part to make a comment when we're talking (inaudible).  The - - he said what he did, and it's a proper motion, but I'm gonna overrule it.

"Normally, a mistrial should be declared only if there is a manifest necessity for such action."  *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)).  "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did."  *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)).  "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Pursuant to the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, a criminal defendant has a fundamental right not to testify.  *See State v. Jackson*, 444 S.W.3d 554, 586 (Tenn. 2014).  It is well-settled that this right prohibits a prosecutor from commenting on a defendant's decision not to testify at trial.  *See Griffin v. California*, 380 U.S. 609, 614-15 (1965) ("For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' . . . which the Fifth Amendment outlaws."); *State v. Hale*, 672 S.W.2d 201, 203 (Tenn. 1984) (cautioning that the "subject of a defendant's right not to testify should be considered 'off-limits' to any conscientious prosecutor").  Even indirect comments on the defendant's decision not to testify are forbidden, and, to this end, our supreme court has "adopted a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify."  *Jackson*, 444 S.W.3d at 587-88 (citations omitted).  A reviewing court must consider "whether the prosecutor's manifest intent was to comment on the defendant's right not to testify" or "whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify."  *Id.* (citations omitted).

-17-

We begin by noting, as did our supreme court in *Jackson*, that "[g]iven that '[t]he impropriety of any comment upon a defendant's exercise of the Fifth Amendment right not to testify is so well settled as to require little discussion,' it is not at all clear why any prosecutor would venture into this forbidden territory." *Id.* (quoting *Ledford v. State*, 568 S.W.2d 113, 116 (Tenn. Crim. App. 1978). Here, during rebuttal argument, the prosecutor stated, "I don't know what happened in that bedroom; he does. He doesn't want to tell us." In our view, this statement was clearly an unconstitutional comment on the defendant's right to remain silent. The prosecutor's "clarification" that the comment was meant to refer to the defendant's refusal to explain to the police how the victim received his injuries does not alter our conclusion because, as our supreme court has observed, "evidence or argument about a defendant's post-arrest, post-*Miranda* silence is impermissible." *Jackson*, 444 S.W.3d at 586 n.43 (citing *Doyle v. Ohio*, 426 U.S. 610, 617 (1976). The defendant's decision to provide a statement waives the privilege against self-incrimination only "[a]s to the subject matter of his statements" and does not operate as a blanket invitation to the prosecution to ascribe meaning to the defendant's silence on other matters. *Anderson v. Charles*, 447 U.S. 404, 408 (1980); *see United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir. 1989) ("[E]ven if a defendant has made statements to the police after receiving *Miranda* warnings, he is deemed to have maintained his silence, unless the post-arrest statements are inconsistent with the defendant's testimony at trial." Said differently, as to those subjects not addressed by the defendant in his statement, he has remained silent, as is his constitutional prerogative, and the State may not comment on that silence. In consequence, the prosecutor's statement, even if it was intended as a remark on the defendant's refusal to admit certain details during his statement, was an unconstitutional remark on the defendant's exercise of his constitutional right.

Because improper commentary on the accused's exercise of his right to remain silent is an error "of constitutional dimension," a reviewing court must apply the standard of harmless error review for non-structural constitutional errors announced in *Chapman v. California*, that is, whether the State has established that the error was harmless beyond a reasonable doubt. *Jackson*, 444 S.W.3d at 591; *Chapman v. California*, 386 U.S. 18, 24 (1967). "When assessing whether the State has met its burden, courts should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Jackson*, 444 S.W.3d 554 at 591 (citations omitted).

Here, the prosecutor's remark was isolated. Like the improper comment at issue in *Jackson*, the comment at issue here occurred during the State's rebuttal closing argument, thus depriving the defendant of any "opportunity to respond to the argument." *Jackson*, 444 S.W.3d at 592. That being said, nothing in the record suggests that the

-18-

prosecutor's delivery of the statement was particularly forceful or in any way remarkable or that the comment was accompanied by any gesture toward the defendant, as was the case in *Jackson*. The defendant did not request any curative instructions either at the time of his contemporaneous objection or at the time of his request for a mistrial, and the trial court gave none. During its general charge, however, the trial court instructed the jury that the statements and arguments of counsel were not evidence and that the jury was to "place no significance on" the defendant's decision not to testify and that "his election to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact." Because these instructions were given as part of the court's general charge, they "did not highlight the prosecutor's comment or the defendant's decision not to testify as the curative instructions given in Jackson did." *State v. Colvett*, 481 S.W.3d 172, 208-09 (Tenn. Crim. App. 2014) (citing *Jackson*, 444 S.W.3d at 592 (stating that the trial court's curative instructions "likely served to emphasize further [Jackson's] exercise of her constitutional right not to testify")). Finally, contrary to the defendant's assertions otherwise, the evidence of his guilt was overwhelming. While alone in the defendant's care, the victim suffered a complex skull fracture and bruising of his brain stem – injuries which led to the victim's death. On balance, we conclude that the error was harmless beyond a reasonable doubt. Consequently, the trial court did not err by denying the defendant's motion for a mistrial.

## VI. Sufficiency

The defendant avers that the evidence was insufficient to support his convictions, arguing that there was evidence of other, plausible explanations for the victim's injuries.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as

well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

In this case, the defendant was charged with felony murder in the perpetration of aggravated child abuse but convicted of the lesser included offense of reckless homicide, which is "a reckless killing of another." T.C.A. § 39-13-215(a). He was also charged with aggravated child abuse, which required the State to establish that the defendant "knowingly, other than by accidental means," treated the victim "in such a manner" that "result[ed] in serious bodily injury to the" victim. T.C.A. §§ 39-15-401(a); -402(a)(1). "'Knowing,'" in this instance, "means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-106(20). For purposes of the aggravated child abuse statute,

> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

*Id.* § 39-15-402(d).

The evidence adduced at trial established that when the victim's mother left the victim and his siblings alone with the defendant, the victim was uninjured and behaving normally. When she returned home following the defendant's report that he was having difficulty rousing the victim, the victim was near death. When paramedics arrived, the victim was unconscious and "not breathing adequately." When Doctor Perales examined the victim, she saw "a very critical patient who required assistance to breathe, . . . medicines to have his blood pressure stay stable, and monitoring of . . . how much pressure was around his brain at all times." Doctor Perales could not even perform a full examination of the victim's body because even small movements would increase the victim's blood pressure, causing an increase in the intracranial pressure. Medical imaging "showed that the [victim] had what we call occipital fracture," fluid between all the layers of his brain and skull and "even had bleeding between the bone and the scalp," and "a lot of brain swelling." He also suffered a rupture of his cervical spine. She testified that the victim's injuries were the result of "a great amount of force. . . . A force that if someone were to witness that event, they would know that that child was injured." She said that the victim's injuries could not have come from his falling onto a window sill while jumping on the bed, from his fainting in the bath, from his falling backwards

onto a carpeted floor, or his stumbling into a dresser. She went so far as to say that there was no scenario under which the victim could have caused the injuries to himself. Doctor Perales' testimony was corroborated by Doctor Lochmuller's findings during the autopsy of the victim. He observed that the victim had suffered "a complex skull fracture" as well as a "whiplash-like" injury to his brain that caused significant swelling of the victim's brain and brain stem. The injury to the victim's brain stem paralyzed the victim, rendering him unable to breath.

In light of the medical testimony, the defendant's assertion on appeal that "the evidence in this case was perhaps suspicious," is absurd. The defendant was alone in the room with a five-year-old child who suffered injuries that medical experts equated with having been injured in a car accident or while skydiving. We hold that the evidence was sufficient to support both convictions.

## VII. Cumulative Error

The defendant asserts that the cumulative effect of the errors deprived him of his constitutional rights to due process and a fair trial. Having considered the issues presented on appeal and having concluded that the defendant is not entitled to relief for any, we conclude that the cumulative effect of the alleged errors does not warrant reversal.

## VIII. Sentencing

Finally, the defendant contends that the effective sentence imposed by the trial court is excessive.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The defendant argues that the trial court abused its discretion by "basing its harsh sentence on an imagined sequence of events – [The defendant] was playing video games while [the victim] was unconscious – was not supported by the testimony at trial." The record, however, belies the defendant's assertion. At trial, the victim's mother testified that when she arrived home after the defendant reported that he could not rouse the victim, her other children "were in the master bedroom with" the defendant "playing the X-box." Although it was not entirely clear whether she meant that the defendant was actually playing the video game or whether he was in the room while the children played, we do not believe the distinction is significant enough to undermine the entire sentencing decision of the trial court. We would also note that this court has previously indicated that the fact that the defendant "'sat playing video games' while the unresponsive victim lay only a few feet away" reflected poorly on the defendant's "potential for rehabilitation or treatment" and was thus an appropriate fact to be considered at sentencing. *State v. Mark Takashi*, No. E2010-01818-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Knoxville, Sept. 27, 2012).

## *Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE